1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   GABRIEL VERDUGO,                        Case No.   1:22-cv-00454-JLT-HBK (HC)

12                  Petitioner,              FINDINGS AND RECOMMENDATIONS TO
                                             DENY PETITION FOR WRIT OF HABEAS
13        v.                                 CORPUS AND DECLINE TO ISSUE
                                             CERTIFICATE OF APPEALABILITY [1]
14   CHRISTIAN PFEIFFER,
                                             FOURTEEN-DAY OBJECTION PERIOD
15                  Respondent.

16

17

18   **I.     STATUS**

19          Petitioner Gabriel Verdugo ("Petitioner" or "Verdugo"), a state prisoner, is proceeding pro

20   se on his Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on April 18, 2022.

21   (Doc. No. 1, "Petition").  Petitioner challenges his conviction after a jury trial for first degree

22   murder with sentencing enhancements for the personal use of a firearm in the commission of a

23   felony and for the personal and intentional discharge of a firearm causing great bodily injury or

24   death.  (Case No. BF162018A).  (Doc. 14-1 at 1988; *see id.* at 230-32).[2]  The Kern County

25

26   [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302
     (E.D. Cal. 2022).

27   [2] All citations to the pleadings and record are to the page number as it appears on the Case Management
28   and Electronic Case Filing ("CM/ECF") system.

                                             1

1   Superior Court sentenced Petitioner to an aggregate term of 50 years to life in prison.  (*Id.* at

2   1988; *see id.* at 397-98).

3          On appeal, the Fifth Appellate District Court remanded to the trial court to allow

4   Petitioner an opportunity to raise the issue of his ability to pay the fines, fees, and assessments

5   imposed by the judgment.  (Case No. F077101).  (Doc. No. 14-1 at 2004).  The appellate court

6   also instructed the trial court to correct a clerical error in the minute order from Petitioner's

7   sentencing hearing.  (*Id.*).  The appellate court otherwise affirmed the judgment.  (*Id.*).  On April

8   14, 2021, the California Supreme Court summarily denied Verdugo's petition for review.  (Case

9   No. S267398).  (*Id.* at 2077).

10         The instant federal Petition presents the following (restated) grounds for relief:

11                 (1) The prosecution misstated the law in closing argument,
                   impermissibly lowering the burden of proof.
12
                   (2) Trial counsel was ineffective for failing to object to the
13                 prosecution's incorrect statements of the law.

14                 (3) The trial court improperly instructed the jury on voluntary
                   intoxication.
15
                   (4) The cumulative errors worked to weaken the burden of proof.
16

17  (*See* Doc. No. 1 at 4-5).  Respondent filed an Answer (Doc. No. 15), arguing Petitioner was not

18  entitled to relief on any of his grounds, and lodged the state court record in support (Doc. Nos. 14,

19  14-1).  Petitioner did not file a traverse and the time to do so has expired.  This matter is deemed

20  submitted on the record before the Court.  After careful review of the record and applicable law,

21  the undersigned recommends the district court deny Petitioner relief on his Petition and decline to

22  issue a certificate of appealability.

23     **II.      GOVERNING LEGAL PRINCIPLES**

24         **A.      Evidentiary Hearing**

25         In deciding whether to grant an evidentiary hearing, a federal court must consider whether

26  such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

27  would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474

28  (2007).  "It follows that if the record refutes the applicant's factual allegations or otherwise

1    precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*.  Here,

2    the state courts adjudicated Petitioner's claims for relief on the merits.  This Court finds that the

3    pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary

4    hearing is required.  *Cullen v. Pinholster*, 563 U.S. 170 (2011).

5    **B.    ADEPA General Principles**

6    A federal court's statutory authority to issue habeas corpus relief for persons in state

7    custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

8    Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

9    first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

10   the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

11   of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

12   the merits, then AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v. Hinojosa*,

13   136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits relief on a

14   claim adjudicated on the merits, but only if the adjudication:

15
16   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

17
18   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

19   28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

20   *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

21   "Clearly established federal law" consists of the governing legal principles in the

22   decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

23   U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

24   unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

25   to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

26   governing law set forth by Supreme Court case law; or (2) reached a different result from the

27   Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

28   12, 16 (2003).

3

1         A state court decision involves an "unreasonable application" of the Supreme Court's

2    precedents if the state court correctly identifies the governing legal principle, but applies it to the

3    facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S.

4    133, 134 (2005), or "if the state court either unreasonably extends a legal principle from

5    [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to

6    extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362,

7    407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas

8    relief so long as fair-minded jurists could disagree on the correctness of the state court's

9    decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the

10   state court decision "was so lacking in justification that there was an error well understood and

11   comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

12        When reviewing a claim under § 2254(d), any "determination of a factual issue made by a

13   State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting

14   the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt*

15   *v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable

16   merely because the federal habeas court would have reached a different conclusion in the first

17   instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

18        Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any

19   constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v.*

20   *Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court explained, while the passage of

21   AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-

22   prejudice requirement. *Brown v. Davenport*, 596 U.S. 118, 134 (2022). In other words, a habeas

23   petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 138 ("[O]ur equitable

24   precedents remain applicable 'whether or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S.

25   112, 121 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails

26   to satisfy either [*Brecht*] or AEDPA. But to grant relief, a court must find that the petition has

27   cleared both tests." *Id*. at 134.

28        As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

an "adjudication on the merits" in state court. An adjudication on the merits does not require that there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S. at 98. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99. "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id*. at 99-100. This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision in order to apply the deferential standard. When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do." *Id*. at 1196.

## III.   RELEVANT FACTUAL BACKGROUND

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Fifth District Court of Appeal. A presumption of correctness applies to these facts. *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

> The victim in this case, Elvis G., arrived at the El Escorpion bar in Bakersfield around 10:45 p.m. one night in August 2015 and sat at the service counter. The manager, Lorena G., knew Elvis from the bar. Lorena hired women to serve male customers drinks and keep them company, and Aricema S., a friend of Lorena's who also knew Elvis from the bar, was working that night, along with several other new employees. Aricema and Elvis had a friendly relationship but

just began talking again that night after some sort of falling out several days earlier, and Aricema testified that Elvis was buying another woman drinks to make her jealous.

Ariana S., who was defendant's girlfriend and shares two children with him, was working that night, as was a woman named Rumor. Both were newly hired. Ariana did not care for the job because it made her uncomfortable, and she thought about leaving several times, telling Lorena at one point that she needed to leave because her baby was ill. She stayed, however, and she sat with Elvis at the service counter. They talked and he bought her some drinks. At around 12:20 a.m., Elvis grabbed Ariana's hand and asked her to dance. She said no and he immediately dropped her hand. Ariana testified Elvis touched her only that one time, he was fine when she said no to dancing, and he did not act disrespectfully toward her.

Defendant arrived at the bar around 1:00 a.m. to pick Ariana up, and he handed Lorena a business card for a marijuana dispensary and left another business card on the bar top. He played pool with some men he appeared to know and drank some beer. Lorena and Aricema were somewhat concerned because defendant and his friends looked like they might have some gang involvement.

Ariana testified that at some point after defendant's arrival, the group of women working had an argument or discussion regarding Elvis going behind the service counter and touching Lorena, and although Ariana did not see Elvis go behind the bar or touch Lorena, she told the others that Lorena liked it. However, Aricema was not aware of any complaints about Elvis, and Lorena denied that there was any argument or conversation regarding Elvis or that he touched her. Lorena said Elvis went into the office with her for a few minutes, but he just wanted to say good-bye. He told her he would not be seeing her again and to be careful because the women she just hired "were not good."

Ariana denied she told defendant that Elvis had grabbed her hand earlier and asked her to dance, but sometime after 1:30 a.m., Lorena saw defendant and his friend, Rumor, leave the bar. They then returned, and Lorena heard Rumor tell defendant that Elvis was disrespectful to her and to kill him.

At approximately 1:39 a.m., defendant, along with some other men, approached Elvis and defendant confronted him. Aricema, who was on the other side of the bar counter from Elvis, said defendant sounded upset and asked Elvis why he was talking to and touching defendant's girl. Elvis looked at defendant, laughed it off, said "[w]hat the fuck?" and "pretty much ignor[ed] him." Aricema told defendant that Elvis was with her, but defendant pulled a gun from his waistband, racked the slide, placed the muzzle near Elvis's left eye, and fired. Elvis fell to the ground and the coroner testified that he died instantly.

Evidenced by footage from various surveillance cameras, defendant left the bar with Ariana after shooting Elvis and handed the gun to another man, who concealed it and walked out of view. Defendant

6

1    and Ariana left in his car, and he took her to her mother's house.
     Later that morning, defendant picked her up and, against her will,
2    drove to a motel out of town. After a few days, Ariana arranged for
     someone to pick her up and take her home. She denied defendant
3    said anything about the shooting or told her why he shot Elvis, and
     she denied that he threatened her, although she conceded he had
4    gang connections that concerned her.

5    After the shooting, Lorena locked the bar and left with Aricema. A
     friend of Aricema's picked her up from Lorena's house, and Lorena
6    contacted a friend who is an attorney for advice. Lorena's friend
     called 911, and the two of them met sheriff's deputies at the bar
7    around 3:00 a.m.

8    The bar had multiple surveillance cameras and defendant was
     quickly identified as the suspect through the camera footage and the
9    business cards he left behind. Defendant was thereafter identified in
     a photo lineup by multiple witnesses, including Ariana, but almost
10   two years passed before he was located and arrested in Mexico.

11   (Doc. No. 14-1 at 1989-90 (footnote omitted)).

12   **IV.    ANALYSIS**

13       Each of Petitioner's grounds were raised on direct appeal to the Fifth Appellate District

14   Court and denied on the merits, then subsequently raised and summarily denied by the California

15   Supreme Court.  Thus, each ground is exhausted, and the Court looks through to the Fifth

16   Appellate District's reasoned decision in evaluating the claims under the deferential standard of

17   review.  *Wilson*, 138 S. Ct. at 1192.

18       **A.    Ground One-Prosecutorial Misconduct**

19       In his first ground, Petitioner argues the prosecution misstated the law regarding

20   premeditation and deliberation by using a "yellow light analogy" to indicate that deliberation and

21   premeditation could occur in the "blink of an eye."  (Doc. No. 1 at 4).

22       **1.  State Court Decision**

23   The Fifth Appellate District denied Plaintiff's prosecutorial misconduct claim as follows:

24       **A. Background**

25   The jury convicted defendant of willful, deliberate and
     premeditated murder. On appeal, defendant argues that the
26   prosecutor misstated the law with respect to the definition of
     deliberation, reducing the prosecution's burden of proof, and that
27   the error was prejudicial under any standard of review. The People
     contend that defendant forfeited review of his claim because
28   counsel failed to object at trial, the prosecutor did not misstate the

7

1    law, and even assuming error, it was harmless.

2    The trial court instructed the jury on first degree murder pursuant to
     CALCRIM No. 521 as follows:

3

4    "The defendant is guilty of first-degree murder if the People have
     proved that he acted willfully, deliberately, and with premeditation.
     The defendant acted willfully if he intended to kill. The defendant

5    acted deliberately if he carefully weighed the considerations for and
     against his choice and, knowing the consequences, decided to kill.

6    The defendant acted with premeditation if he decided to kill before
     completing the act that caused death.

7

8    "The length of time the person spends considering whether to kill
     does not alone determine whether the killing is deliberate and
     premeditated. The amount of time required for deliberation and

9    premeditation may vary from person to person and according to the
     circumstances.

10

11   "A decision to kill made rashly, impulsively, or without careful
     consideration is not deliberate and premeditated. On the other hand,
     a cold, calculated decision to kill can be reached quickly. The test is

12   the extent of the reflection, not the length of time."

13   Relevant to defendant's claim of error, during closing argument, the
     prosecutor relied on a yellow traffic light analogy to illustrate a

14   rapid but deliberate and premeditated decision; and during rebuttal
     the prosecutor referred to deliberation while addressing voluntary

15   intoxication. Placed in context, the portions of argument defendant
     objects to are as follows:

16

17   "A common example that is used in describing issues of
     premeditation and deliberation, making a choice, thinking about the
     consequences, and being able to do it almost *instantaneously*, is

18   something that probably everyone has done at some point.

19   "You are driving on the road. Maybe you are late for work. You are
     coming up to a traffic signal. It's green. You think you are going to

20   make it, but then the light turns yellow. And you have a decision.
     You know you have enough time to stop, but you are late and you
     want to make it. *So within an instant you make a choice.* Do I slow

21   down, play it safe, maybe be a little bit late for work, or do I risk a

22   ticket, risk an accident, and go through the light knowing it's going
     to turn red right before I go through the intersection.

23

24   "*People make those choices instantaneously.* You consider the
     consequences of your actions. You know the consequences of your
     actions, and you make a choice. That's how quickly premeditation

25   and deliberation can happen. All that is required is the ability and
     the amount of time to make that type of decision, to make a

26   decision to weigh the consequences of the action and to make the
     decision to follow through with it. Clearly, that's what we have in

27   this case.

28   "The defendant has ample time before he even approaches Elvis ...

8

to decide what he is going to do. He has ample time to go to his car and get a gun. He has time to go up to Elvis ... and start talking to him to confront him. He has time to hear Elvis ... kind of brush him off, which is pretty much what happens because what the defendant is saying is so ridiculous. Because you can watch the video, and I encourage you to watch it all the way through." (Italics added.)

During rebuttal, the prosecutor argued:

"So you can consider the voluntary intoxication evidence, if any, to decide whether the defendant was capable of doing that. Was the defendant so drunk that he couldn't have possibly realized the considerations for and against his choice, not knowing the consequences of his choice?

"Do you really think the defendant was so drunk that he didn't know that shooting Elvis ... in the head would kill him? Of course not. He knew very well what was going on. He wasn't too drunk to understand that, and you can tell by what he does afterwards. Because he knows what he's done is wrong. He knew it when he did it, and he knew it immediately after. That's why he goes to the car, that's why he hands off the gun, and that's why he flies out of that parking lot as fast as he can. Because he knows the choices that he's made, and he knows the consequences for them. He's already thought about them. He knew about it well before he acted. He's not too drunk to get what he is doing is the point. *That's the deliberation.*

"You can also consider voluntary intoxication to determine whether the defendant acted with premeditation which is—premeditation is deciding to kill before completing the act that caused death. [¶] So was the defendant so drunk that he hadn't actually decided to kill Elvis before pulling the trigger? There's no reason to pull the trigger when you have the gun against his head. He wasn't too drunk to form the intent required for murder, the intent to kill. He wasn't too drunk to understand the consequences of his choice, to make decisions that led to deadly consequences to Elvis .... The law doesn't allow a pass for people who have a few beers before they commit a public execution." (Italics added.)

**B. Legal Standard**

The legal standard governing claims of prosecutorial error is well established. "Under the federal Constitution, a prosecutor's behavior deprives a defendant of his rights 'when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gamache* (2010) 48 Cal.4th 347, 370–371, 106 Cal.Rptr.3d 771, 227 P.3d 342; accord, *People v. Peterson* (2020) 10 Cal.5th 409, 464, 268 Cal.Rptr.3d 56, 472 P.3d 382; *People v. Hill, supra*, 17 Cal.4th at p. 819, 72 Cal.Rptr.2d 656, 952 P.2d 673.) "Conduct that falls short of that standard 'may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' " (*People v. Gamache, supra*, at p. 371, 106 Cal.Rptr.3d 771, 227

P.3d 342; accord, *People v. Peterson, supra*, at p. 464,; *People v. Hill, supra*, at p. 819, 72 Cal.Rptr.2d 656, 952 P.2d 673.) " 'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Gamache, supra*, at p. 371, 106 Cal.Rptr.3d 771, 227 P.3d 342; accord, *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 657, 256 Cal.Rptr.3d 1, 453 P.3d 1038; *People v. Centeno* (2014) 60 Cal.4th 659, 667, 180 Cal.Rptr.3d 649, 338 P.3d 938.)

## C. Analysis

"To preserve a claim for appeal under either state or federal law, a defendant must raise a contemporaneous objection at trial and seek a jury admonition. [Citation.] In the absence of an objection, any claim is forfeited unless an exception applies." (*People v. Gamache, supra*, 48 Cal.4th at p. 371, 106 Cal.Rptr.3d 771, 227 P.3d 342; accord, *People v. Peterson, supra*, 10 Cal.5th at pp. 464–465; *People v. Hill, supra*, 17 Cal.4th at p. 820, 72 Cal.Rptr.2d 656, 952 P.2d 673.) As the People point out, defense counsel did not object to the portions of closing argument now at issue on appeal and defendant does not defend this omission based on any exception to the general rule of forfeiture. However, because defendant advances a related claim that counsel rendered ineffective assistance by failing to object, we elect to resolve the issue of prosecutorial error on the merits.

Defendant argues that "[w]hether purposeful or not, the [prosecutor's] argument was designed to persuade the jury to disregard [his] defense that there was reasonable doubt as to whether he deliberated. The prosecutor's comments were not benign; they were a calculated attempt to persuade the jury that [his] decision to put a bullet in the chamber of his gun and fire a single shot alone was proof beyond a reasonable doubt of deliberation." We disagree with defendant that the prosecutor misstated the law during closing argument, and even if we assume error for the sake of argument, it was harmless.

### 1. No Error

The prosecutor's reliance on a yellow light analogy to illustrate the concept of deliberation and premeditation was not unique. (*People v. Avila* (2009) 46 Cal.4th 680, 715, 94 Cal.Rptr.3d 699, 208 P.3d 634 [rejecting prosecutorial error claim relating to yellow light analogy]; *People v. Son* (2020) 56 Cal.App.5th 689, 698–700, 270 Cal.Rptr.3d 83 [same]; *People v. Wang* (2020) 46 Cal.App.5th 1055, 1086–1087, 260 Cal.Rptr.3d 343 [same]; *People v. Henderson* (2020) 46 Cal.App.5th 533, 548–551, 260 Cal.Rptr.3d 104, review granted Dec. 23, 2020, S265172 [finding prosecutorial error claim forfeited and rejecting claim that trial counsel's failure to object to yellow light analogy was ineffective or prejudicial].) Although the prosecutor used the terms "almost instantaneously" and "within an instant," viewed in context, the prosecutor clearly argued that killing with premeditation and deliberation is similar to

running a yellow light in that the decision or choice may be made very rapidly but after reflecting and weighing the consequences. Critically, the argument did not have the effect of undermining the trial court's instruction to the jury that "defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill."

Further, defendant's argument was recently considered and rejected by two appellate courts. The Court of Appeal in *People v. Wang* explained, "Consistent with the law, the prosecutor used the traffic light illustration to explain the concept of premeditation and deliberation as a weighing of options that can happen very quickly. (CALJIC No. 8.20 [' "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action']; *People v. Pearson* (2013) 56 Cal.4th 393, 440, 154 Cal.Rptr.3d 541, 297 P.3d 793.) The illustration was consistent with the law." (Cal.App.5th at p. 1085; accord, *People v. Son, supra*, 56 Cal.App.5th at pp. 699–700.) We agree and reject defendant's contention that the prosecutor's argument misled the jury into believing that an instantaneous decision made without weighing considerations and consequences suffices to show premeditation and deliberation.

We also reject defendant's contention that the prosecutor's yellow light analogy "trivialized [the issue] to the blink of an eye." (*People v. Avila, supra*, 46 Cal.4th at p. 715, 94 Cal.Rptr.3d 699, 208 P.3d 634 [prosecutor did not equate decision whether to stop at yellow light with cold, calculated judgment of murder, but instead used assessment of circumstances as an example of a judgment that is cold and calculated but quick].) Although we agree prosecutors must exercise caution to ensure their word choice does not suggest action that is instantaneous and without reflection, the record in this case does not support the interpretation that the prosecutor misled the jury by trivializing or dismissing the deliberative process required to support a finding of willful, deliberate and premeditated murder.

**2.  Any Error Harmless**

Moreover, even if we assume for the sake of argument that the prosecutor erred, any error was harmless. As previously stated, where, as here, an error does not rise to the level of a due process violation by rendering the trial fundamentally unfair, we ask whether there is a " 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Gamache, supra*, 48 Cal.4th at p. 371, 106 Cal.Rptr.3d 771, 227 P.3d 342; accord, *People v. Beck and Cruz, supra*, 8 Cal.5th at p. 657; *People v. Centeno, supra*, 60 Cal.4th at p. 667, 180 Cal.Rptr.3d 649, 338 P.3d 938.)

The evidence shows that after playing pool for a while, defendant left the bar with Rumor and then returned. As they reentered, Rumor told defendant that Elvis had disrespected her, although Lorena, Aricema and Ariana all testified that Elvis was not

11

1   disrespectful and he did not touch any of the women other than
    picking up Ariana's hand when he asked her to dance with him.
2   Defendant approached with several other men and confronted Elvis
    about "touching his girl." Elvis did not react aggressively, did not
3   reach for anything, and essentially ignored defendant other than
    laughing and saying, "What the fuck?" Defendant removed a gun
4   from his waistband; racked the slide, ejecting a live round that was
    recovered from the floor by law enforcement; placed the gun
5   against Elvis's face; and fired one shot. Defendant's actions, which
    amounted to a coldblooded execution of someone who was
6   unresisting and nonthreatening, were captured on surveillance
    camera. This allowed the jury to see the crime as it occurred and to
7   evaluate defendant's actions in that context.

8   Moreover, the jury was instructed with the definition of deliberation
    and premeditation, instructed that it must follow the court's
9   instructions to the extent the attorneys' comments conflicted with
    those instruction, and instructed that the attorneys' remarks are not
10  evidence. The admonitions regarding the need to follow the court's
    instructions and that the attorneys' remarks are not evidence were
11  repeated when defense counsel objected during the prosecutor's
    rebuttal argument. The prosecutor also reviewed the definition of
12  deliberation and premeditation during argument using language that
    mirrored the jury instruction. We are unpersuaded that under these
13  circumstances, there is a reasonable likelihood the jury applied the
    prosecutor's yellow light illustration in a manner not permitted
14  under the law. Accordingly, even if we assume error, it was
    harmless.

15

16  (Doc. No. 14-1 at 1991-96).

17              **2.  Analysis**

18          Petitioner argues that the prosecutor's use of the yellow light analogy amounted to a

19  misstatement of the law and lowered the burden of proof.  (Doc. No. 1 at 4).  However, Petitioner

20  wholly fails to engage with the state court's analysis and rejection of this claim or present any

21  argument as to why the state court's decision was contrary to, or an unreasonable application of,

22  Supreme Court precedent or based on an unreasonable determination of the facts.  Respondent

23  argues the state court's decision was reasonable and Petitioner failed to carry his burden of

24  showing otherwise.  (Doc. No. 15 at 4).

25          "To decide if improper comments give rise to a constitutional violation, the relevant

26  question is whether the prosecutors' comments so infected the trial with unfairness as to make the

27  resulting conviction a denial of due process."  *Michaels v. Davis*, 51 F.4th 904, 951 (9th Cir.

28  2022) (quotation marks omitted) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

1    Importantly, "a slight misstatement of law by a prosecutor can be rendered harmless by the

2    court's proper instruction to the jury. And under Supreme Court precedent, a jury is presumed to

3    follow the trial court's instructions." *Deck v. Jenkins*, 814 F.3d 954, 979 (9th Cir. 2016) (citation

4    modified).

5         Here, the appellate court correctly cited the applicable standard and concluded the

6    prosecution's yellow light analogy was an appropriate illustration under California law of how

7    "the decision or choice may be made very rapidly but after reflecting and weighing the

8    consequences." (Doc. No. 14-1 at 1994). This Court is bound by the state court's interpretation

9    of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state

10   court's interpretation of state law, including one announced on direct appeal of the challenged

11   conviction, binds a federal court sitting in habeas corpus.").

12        Consideration of the remainder of the prosecution's closing negates any argument that the

13   analogy rendered the trial fundamentally unfair because the prosecution did not argue that

14   Petitioner made a split-second decision. Rather, the prosecution argued Petitioner had "ample

15   time before he even approache[d] Elvis … to decide what he [was] going to do" and had "all the

16   time in the world to make his decision and weigh the consequences of his action." (Doc. 14-1 at

17   1169). The prosecution highlighted that Petitioner had "ample time to go to his car and get a

18   gun," "go up to Elvis … and start talking to him to confront him," and "hear Elvis … kind of

19   brush him off" before the shooting. (*Id.*). Thus, "there is no reasonable likelihood that the

20   prosecutor's [yellow light] analogy caused the jury to misapply the law regarding first-degree

21   murder." *Perez v. Johnson*, No. CV 22-1302 RSWL (PVC), 2023 WL 3293368, at *13 (C.D.

22   Cal. Mar. 1, 2023) (rejecting habeas challenge to prosecution's use of a texting while driving

23   analogy to illustrate the how quickly premeditation and deliberation can occur where prosecution

24   did not argue defendant made the decision in a split second) (collecting cases), *report &*

25   *recommendation adopted*, 2023 WL 3292866 (C.D. Cal. May 4, 2023).

26        Additionally, the trial court properly instructed the jury on premeditation and deliberation.

27   (Doc. No. 14-1 at 1149-50). The court instructed the jury to follow the law as explained by the

28   court and that if "the attorneys' comments on the law conflict with [the court's] instructions, you

                                                      13

1   must follow [the court's] instructions." (*Id.* at 1133). The jury is presumed to have followed

2   these instructions. *Deck*, 814 F.3d at 979. Thus, even if the prosecution's analogy was improper,

3   the state appellate court reasonably concluded it did not so infect the trial with unfairness as to

4   make the resulting conviction a denial of due process such that it did not amount to a

5   constitutional violation. *Michaels*, 51 F.4th at 951.

6         Because the prosecution's yellow light analogy did not rise to the level of a constitutional

7   error, Petitioner cannot show that the state court's rejection of his prosecutorial misconduct claim

8   was contrary to, or an unreasonable application of, clearly established federal law, or based upon

9   an unreasonable determination of the facts. Thus, the undersigned recommends that ground one

10   be denied.

11        **B.**     **Ground Two-Ineffective Assistance of Counsel**

12         In his second ground, Petitioner argues his trial counsel was ineffective for failing to

13   object to the prosecution's statements during closing argument. (Doc. No. 1 at 4).

14             **1.  State Court Decision**

15         As detailed above, the state court concluded that the prosecution's statements during

16   closing argument were not improper and, even if they were, any error was harmless. (*See* Doc.

17   No. 14-1 at 1993-96). The appellate court noted in a footnote following the discussion that these

18   conclusions rendered any argument that Petitioner received ineffective assistance of counsel

19   "moot." (*Id.* at 1996 n.7).

20             **2.  Analysis**

21         Petitioner argues his counsel's failure to object to the prosecution's closing argument

22   amounted to prejudicial error because the argument was "extremely powerful" and worked to

23   lower the burden of proof. (Doc. No. 1 at 4). However, Petitioner once again fails to engage with

24   the state appellate court's decision rejecting his claim or present any argument as to why the

25   decision was contrary to, or an unreasonable application of, Supreme Court precedent or based on

26   an unreasonable determination of the facts. Respondent argues the state court reasonably rejected

27   the claim and "Petitioner's failure to show that was incorrect even de novo, let alone

28   unreasonable" is fatal to his habeas claim. (Doc. No. 15 at 4).

1   Criminal defendants have a right to counsel at trial and on direct appeal.  U.S. Const.

2   Amend VI.  Claims alleging that trial or appellate counsel were constitutionally ineffective

3   require the Court to engage in the two-step analysis set forth in *Strickland v. Washington*,

4   466 U.S. 668 (1984).  Under the first prong of that test, the petitioner must prove that his

5   attorney's representation fell below an objective standard of reasonableness.  *Id*. at 687-88.

6   To demonstrate deficient performance, the petitioner must show his counsel "made errors so

7   serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the

8   Sixth Amendment."  *Id*. at 687; *Williams v. Taylor*, 529 U.S. 362, 391 (2000).  In reviewing

9   trial counsel's performance, however, "counsel is strongly presumed to have rendered

10  adequate assistance and made all significant decisions in the exercise of reasonable

11  professional judgment."  *Strickland*, 466 U.S. at 690; *Yarborough v. Gentry*, 540 U.S. 1, 8

12  (2003).  Only if counsel's acts and omissions, examined within the context of all the

13  circumstances, were outside the "wide range" of professionally competent assistance, will

14  petitioner meet this initial burden.  *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986);

15  *Strickland*, 466 U.S. at 689-90.

16  Under the second part of *Strickland's* two-prong test, the petitioner must show that he

17  was prejudiced by counsel's conduct.  466 U.S. at 694.  Prejudice is found where there is a

18  reasonable probability that, but for his counsel's errors, the result would have been different.

19  *Id*.  The errors must not merely undermine confidence in the outcome of the trial but must

20  result in a proceeding that was fundamentally unfair.  *Williams*, 529 U.S. at 393 n.17;

21  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  The petitioner must prove both prongs:

22  deficient performance and prejudice.  A court need not, however, determine whether

23  counsel's performance was deficient before determining whether the petitioner suffered

24  prejudice as the result of the alleged deficiencies.  *Strickland*, 466 U.S. at 697 ("If it is easier

25  to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we

26  expect will often be so, that course should be followed.").

27  Here, the state appellate court rejected Petitioner's ineffective assistance claim as

28  moot based on its conclusion that there was no error in the prosecution's closing argument

1   and any error was harmless.  (Doc. 14-1 at 1996 n.7).  In terms of the *Strickland* test, the

2   conclusion that there was no error in the yellow light analogy forecloses any argument that

3   counsel was deficient for failing to object during closing argument.  Further, even if

4   Petitioner could prevail on the deficiency prong here-not conceded-Petitioner cannot show

5   prejudice under the second prong of *Strickland* for the same reasons discussed above with

6   respect to ground one.  This lack of prejudice alone was sufficient grounds to reject

7   Petitioner's ineffective assistance claim.  *Strickland*, 466 U.S. at 687 ("Unless a defendant

8   makes both showings, it cannot be said that the conviction or death sentence resulted from a

9   breakdown in the adversary process that renders the result unreliable.").

10      Thus, Petitioner cannot show that the state court's rejection of his ineffective

11  assistance claim was contrary to, or an unreasonable application of, clearly established

12  Supreme Court precedent, nor that it was based on an unreasonable determination of the

13  facts.  The undersigned recommends that ground two be denied.

14      **C.      Ground Three-Instructional Error**

15      In ground three, Petitioner argues the trial court erred when it instructed the jury regarding

16  voluntary intoxication.  (Doc. No. 1 at 5).

17      **1.  State Court Decision**

18      The appellate court rejected Petitioner's instructional error claim on direct review, in its

19   reasoned decsion:

20      **A.  Background**

21      With respect to the issue of voluntary intoxication, section 29.4
22      provides:

23      "(a) No act committed by a person while in a state of voluntary
       intoxication is less criminal by reason of his or her having been in
       that condition. Evidence of voluntary intoxication shall not be
24      admitted to negate the capacity to form any mental states for the
       crimes charged, including, but not limited to, purpose, intent,
25      knowledge, premeditation, deliberation, or malice aforethought,
       with which the accused committed the act.

26
27      "(b) Evidence of voluntary intoxication is admissible solely on the
       issue of whether or not the defendant actually formed a required
       specific intent, or, when charged with murder, whether the
28      defendant premeditated, deliberated, or harbored express malice

16

aforethought.

"(c) Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."

The trial court instructed the jury on the issue with CALCRIM No. 625, the pattern instruction for voluntary intoxication in homicide cases:

"You *may* consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill and whether the defendant acted with deliberation and premeditation.

"A person is voluntarily intoxicated if he becomes intoxicated by willingly using any intoxicating drug, drink, or other substance, knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect.

"You may not consider evidence of voluntary intoxication for any other purpose." (Italics added.)

Relying on the Court of Appeal's decision in *People v. Stevenson* (1978) 79 Cal.App.3d 976, 145 Cal.Rptr. 301 (*Stevenson*), defendant claims that CALCRIM No. 625 misstates the law by instructing the jury that it *may* consider evidence of voluntary intoxication rather than *must* consider the evidence, which shifted the prosecutor's burden of proof and violated his right to a fair trial. He concedes he did not object to the instruction in the trial court, but he contends that no objection was required because the error was not invited and it affected his substantial rights. (§ 1259; *People v. Delgado* (2017) 2 Cal.5th 544, 572, fn. 15, 214 Cal.Rptr.3d 223, 389 P.3d 805; *People v. Townsel* (2016) 63 Cal.4th 25, 59–60, 201 Cal.Rptr.3d 19, 368 P.3d 569.) As discussed, we reject defendant's claim of instructional error and, therefore, we do not reach the issue of whether the forfeiture doctrine applies here. (*People v. Johnson* (2016) 62 Cal.4th 600, 639, 197 Cal.Rptr.3d 461, 364 P.3d 359; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 919, 207 Cal.Rptr.3d 228, 378 P.3d 615.)

**B.  Standard of Review**

We review allegations of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733, 94 Cal.Rptr.2d 396, 996 P.2d 46; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111, 93 Cal.Rptr.2d 433.) "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953, 105 Cal.Rptr.3d 131, 224 P.3d 877.) "[I]nstructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the

entire charge to the jury." (*People v. Holt* (1997) 15 Cal.4th 619, 677, 15 Cal.4th 1385A, 677, 63 Cal.Rptr.2d 782, 937 P.2d 213; accord, *People v. Thomas* (2011) 52 Cal.4th 336, 356, 128 Cal.Rptr.3d 489, 256 P.3d 603.) "If the charge as a whole is ambiguous, the question is whether there is a ' "reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*Middleton v. McNeil* (2004) 541 U.S. 433, 437, 124 S.Ct. 1830, 158 L.Ed.2d 701 (*per curiam*).) Jurors are presumed to have understood and followed the trial court's jury instructions. (*People v. Sandoval* (2015) 62 Cal.4th 394, 422, 196 Cal.Rptr.3d 424, 363 P.3d 41.)

**C. Analysis**

**1. No Error**

At the time *Stevenson* was decided, California recognized the defense of diminished capacity, under which " '[m]alice aforethought could be negated by showing that a person who intentionally killed was *incapable* of harboring malice aforethought because of a mental disease or defect or intoxication.' " (*In re Christian S.* (1994) 7 Cal.4th 768, 774, 30 Cal.Rptr.2d 33, 872 P.2d 574, quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1110, 2 Cal.Rptr.2d 364, 820 P.2d 588, italics added.) The Court of Appeal concluded in *Stevenson* that the trial court's multiple instructional errors were prejudicial because the instructions failed to "proper[ly], full[y] and complete[ly]" instruct on the issue of diminished capacity, which deprived the defendant of "a jury trial on all the issues presented by the evidence." (*Stevenson, supra*, 79 Cal.App.3d at p. 986, 145 Cal.Rptr. 301.) Relevant to defendant's claim in this case, the court in *Stevenson* noted that on remand, former CALJIC No. 3.35, which instructed the jury it *must* consider evidence of voluntary intoxication in determining whether he had specific intent, should be given instead of CALJIC 4.21, which instructed the jury that it *should* consider the evidence of voluntary intoxication. (*Stevenson, supra*, at p. 987, 145 Cal.Rptr. 301.)

We find defendant's reliance on *Stevenson* misplaced. The defense of diminished capacity was abolished by the Legislature in 1981 and evidence of voluntary intoxication is limited to the issue of whether a defendant *actually* formed the requisite intent. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1125, 77 Cal.Rptr.2d 428, 959 P.2d 735; *People v. Saille, supra*, 54 Cal.3d at pp. 1111–1112, 2 Cal.Rptr.2d 364, 820 P.2d 588; § 29.4.) Defendant's argument that it is error to instruct the jury it *may* consider evidence of voluntary intoxication rather than it *must* consider the evidence was rejected by the California Supreme Court in the context of an analogous limiting instruction. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1225, 171 Cal.Rptr.3d 234, 324 P.3d 88 (*Hajek and Vo*), abrogated in part on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216, 200 Cal.Rptr.3d 265, 367 P.3d 649.)

In *Hajek and Vo*, the defendant challenged the limiting instruction regarding mental impairment evidence and advanced the same argument defendant does here: "the use of 'should' and 'may' in the

mental disease or defect instructions ... permitted the jury to disregard entirely his mental impairment defense." (*Hajek and Vo, supra*, 58 Cal.4th at p. 1224, 171 Cal.Rptr.3d 234, 324 P.3d 88.) The court "presume[d] the jurors were capable of reading, understanding, and applying the instruction in this commonsense manner rather than in [the defendant's] hypertechnical manner," and pointed out the "instruction was a limiting instruction that, after referencing [the defendant's] mental impairment evidence, told the jury that its use was confined to determining whether [he] actually formed the requisite mental state for the charged crimes. That is the meaning of the use of the word 'may' in the instruction, as is made clear by the word 'solely' that follows it: 'You *may* consider such evidence *solely* for the purpose of determining whether [the defendant] actually formed the mental state [*sic*] premeditated, deliberated which is an element of the crimes charged ....' (Italics added.) Thus, contrary to [the defendant's] reading, the instruction did not authorize the jury to disregard his mental impairment evidence." (*Id.* at p. 1225, 171 Cal.Rptr.3d 234, 324 P.3d 88.)

A similar claim was also rejected by the court in *People v. Lucas*, which concluded, "It is pure speculation to believe the jury ignored certain evidence simply because an instruction advised the jury that it 'should' or 'may' consider that evidence, instead of commanding the jury to consider that evidence." (*People v. Lucas* (2014) 60 Cal.4th 153, 291, 177 Cal.Rptr.3d 378, 333 P.3d 587, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19, 191 Cal.Rptr.3d 855, 354 P.3d 983.) Decisions from our high court are binding (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 197–198, 112 Cal.Rptr.3d 746, 235 P.3d 62), and defendant advances no arguments that distinguish his claim here from those previously rejected by the California Supreme Court. No error is shown. (*People v. Lucas, supra*, at p. 291, 177 Cal.Rptr.3d 378, 333 P.3d 587; *Hajek and Vo, supra*, 58 Cal.4th at p. 1225, 171 Cal.Rptr.3d 234, 324 P.3d 88.)

**2. Asserted Error Harmless**

Although we reject defendant's claim that CALCRIM No. 625's use of the word "may" is erroneous, it bears mention that the evidence of intoxication was weak in this case. At the time of the crime, defendant was heavyset and described as large, and while the evidence showed he drank some beer that night at the bar, the quantity is unclear. Lorena testified she served him "[m]any" but estimated four or five when pressed and none of the eyewitnesses testified that he appeared intoxicated. There was also no evidence of defendant's blood alcohol level given that he fled after the shooting and remained at large for almost two years. The jury was able to evaluate defendant's actions and watch the killing via the video surveillance footage, and both parties addressed the issue of voluntary intoxication during closing argument, informing the jury that the evidence of intoxication was relevant to its determination whether defendant formed the intent to kill and whether he acted with premeditation and deliberation.

Under these circumstances, the claimed ambiguity was harmless.

1

2

3

4

5

6

7

> (*People v. Nelson* (2016) 1 Cal.5th 513, 548, 205 Cal.Rptr.3d 746, 376 P.3d 1178 [even assuming use of word "may" in limiting instruction regarding mental condition was error, "[I]t is not reasonably likely the jury would have seized upon the use of 'may' in the instruction as license to disregard evidence of the effect [the defendant's] mental condition [had] on the charged offenses."].) Even under the more stringent federal standard of review, we find beyond "reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt* (2017) 2 Cal.5th 819, 831, 216 Cal.Rptr.3d 265, 392 P.3d 421, citing *Neder v. United States* (1999) 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35.)

8

(Doc. No. 14-1 at 1996-2000).

9

### 2. Analysis

10

Petitioner argues that by using "may" instead of "should" when instructing the jury

11

regarding voluntary intoxication, the court provided the prosecutor more leeway to argue that

12

intoxication evidence could be ignored and lowered the prosecution's burden of proof. (Doc. No.

13

1 at 5). As with his earlier grounds, Petitioner's argument wholly fails to engage with the state

14

court's rejection of his claim to show that it was contrary to Supreme Court precedent or based on

15

an unreasonable determination of the facts. Respondent argues the appellate court "disagreed that

16

using a permissive term, as to a directive as to what was not permitted, was a problem" but even

17

if the trial court erred, "the sole effect would have been to allow jurors to exclude intoxication

18

evidence in part, and no prior Supreme Court case is cited that equates exclusion of evidence with

19

Petitioner's legal theories asserted on appeal—in particular, as a directive that the prosecution

20

lacked the burden to prove guilt beyond reasonable doubt." (Doc. No. 15 at 5).

21

As an initial matter, to the extent Petitioner is challenging whether the instruction was

22

proper under state law, such cannot be the basis of federal habeas relief. *See Estelle v.*

23

*McGuire*, 502 U.S. 62, 72 (1991) ("[T]he fact that the instruction was allegedly incorrect

24

under state law is not a basis for habeas relief."). To the extent Petitioner brings an

25

instructional error claim based on federal law, such a claim fails. "A court reviewing a claim

26

of jury instructional error on federal habeas review first considers whether the erroneous

27

instruction amounts to a constitutional error." *Reno v. Davis*, 46 F.4th 821, 841 (9th Cir.

28

2022). Importantly, while "the State must prove every element of the offense, and a jury

1    instruction violates due process if it fails to give effect to that requirement," "not every

2    ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process

3    violation." *Dixon v. Williams*, 750 F.3d 1027, 1032 (9th Cir. 2014) (citing *Middleton v.*

4    *McNeil*, 541 U.S. 433, 437 (2004)). Rather, "[a] constitutional error is established where the

5    ailing instruction by itself so infected the entire trial that the resulting conviction violates due

6    process." *Reno*, 46 F.4th at 841 (quotations omitted). The challenged instructions "may not

7    be judged in artificial isolation, but must be viewed in the context of the overall charge."

8    *Dixon*, 750 F.3d at 1033. Even where a constitutional error occurred, relief is not warranted

9    unless "the erroneous instruction had a 'substantial and injurious effect or influence in

10   determining the jury's verdict.'" *Reno*, 46 F.4th at 841.

11        Here, not only did the state court reject any argument that the instruction was improper, it

12   also concluded that any error was harmless beyond a reasonable doubt because the evidence of

13   intoxication was weak. (Doc. No. 14-1 at 2000). The only evidence concerning Petitioner's

14   alleged intoxication was testimony from one witness that she had served beers to Petitioner

15   (without any indication of how many) and testimony from another witness that she served

16   Petitioner approximately four or five beers. (*Id.* at 959, 998, 1062). There was no other evidence

17   to support that Petitioner, who was described as being overweight and weighing approximately

18   300 pounds, reached a level of intoxication where he could not form the requisite intent to support

19   the first degree murder conviction. Defense counsel even acknowledged that "[t]he effect of the

20   intoxication is somewhat limited in this case." (*Id.* at 1224). Thus, there is no indication that the

21   instruction had a "substantial and injurious effect or influence in determining the jury's verdict."

22   *Reno*, 46 F.4th at 841.

23        Accordingly, Petitioner cannot show that the state court's rejection of his

24   instructional error claim was contrary to, or an unreasonable application of, clearly

25   established Supreme Court precedent, nor that it was based on an unreasonable determination

26   of the facts. The undersigned recommends that ground three be denied.

27        **C.**    **Ground Four-Cumulative Error**

28        In his final ground, Petitioner argues the prosecutor's misstatements of the law combined

21

1   with the instructional error worked together to weaken the burden of proof such that the

2   cumulative error denied him of due process.  (Doc. No. 1 at 5).  Respondent argues that

3   "Petitioner cites no prior Supreme Court case that agree with (rather than rejected) a due process

4   claim based on his theories" and a lack of any error on the other grounds bars habeas relief for

5   cumulative error.  (Doc. No. 15 at 5).

6       "Cumulative error applies where, although no single trial error examined in isolation is

7   sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still

8   prejudice[d] a defendant."  *Cook v. Kernan*, 801 F. App'x 474, 477 (9th Cir. 2020) (internal

9   quotations and citations omitted).  The cumulative error, however, "must render the trial and

10  sentencing fundamentally unfair."  *Id.* (citations omitted).  Absent a finding of any error on any of

11  the proceeding grounds, the Court cannot find cumulative error.  *Williams v. Filson*, 908 F.3d

12  546, 570 (9th Cir. 2018) (a court "cannot consider the cumulative effect of *non*-errors"); *see also*

13  *McGill v. Shinn*, 16 F.4th 666, 684 (9th Cir. 2021).

14      Because the undersigned finds none of Petitioner's preceding claims have merit, the

15  undersigned concludes Petitioner cannot show his conviction was fundamentally unfair nor a

16  "unique symmetry" of harmless errors that "amplify each other in relation to a key contested issue

17  in the case."  *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011).  Thus, ground four is

18  without merit and should be denied.

19      **V.  CERTIFICATE OF APPEALABILITY**

20      A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

21  court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

22  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

23  district court to issue or deny a certificate of appealability when entering a final order adverse to a

24  petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

25  Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

26  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

27  the petitioner to show that "jurists of reason could disagree with the district court's resolution of

28  his constitutional claims or that jurists could conclude the issues presented are adequate to

1    deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *accord Slack v.*

2    *McDaniel*, 529 U.S. 473, 484 (2000). Because Petitioner has not made a substantial showing of

3    the denial of a constitutional right, the undersigned recommends that the court decline to issue a

4    certificate of appealability.

5            Accordingly, it is **RECOMMENDED**:

6            1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. No.

7                1); and

8            2.  Petitioner be denied a certificate of appealability.

9                             **NOTICE TO PARTIES**

10           These Findings and Recommendations will be submitted to the United States District

11   Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days

12   after being served with a copy of these Findings and Recommendations, a party may file written

13   objections with the Court. *Id.*; Local Rule 304(b). The document should be captioned,

14   "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

15   **(15) pages**. The Court will not consider exhibits attached to the Objections. To the extent a party

16   wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

17   CM/ECF document and page number, when possible, or otherwise reference the exhibit with

18   specificity. Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

19   the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

20   636(b)(l)(C). A party's failure to file any objections within the specified time may result in the

21   waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

22

23   Dated:    July 18, 2025

24                                            HELENA M. BARCH-KUCHTA
                                             UNITED STATES MAGISTRATE JUDGE
25

26

27

28